UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| TRANSCO LINES, INC., | |
|---|---|
| Plaintiff, | |
| v. | No. 16 CV 10982 |
| EXTRA LOGISTICS, INC., | Judge Manish S. Shah |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

On August 21, 2018, I granted Transco Lines, Inc.'s motion for summary judgment and denied Extra Logistics, Inc.'s motion for summary judgment. Extra Logistics moves for reconsideration under Federal Rule of Civil Procedure 59(e).

**I.  Legal Standards**

A party may file a motion to amend or alter a judgment pursuant to Federal Rule of Civil Procedure 59(e). Fed. R. Civ. P. 59(e). The moving party must "clearly establish . . . that the court committed a manifest error of law or fact." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 955 (7th Cir. 2013). A motion for reconsideration under Rule 59(e) is the appropriate vehicle for directing the district court's attention to an alleged error of law so that the court may (if necessary) correct its own errors, *Moro v. Shell Oil Co.,* 91 F.3d 872, 876 (7th Cir. 1996)*,* and "can be used . . . to ask that a judgment be set aside in its entirety." *A.D. Weiss Lithograph Co. v. Illinois Adhesive Prod. Co.*, 705 F.2d 249, 250 (7th Cir. 1983).

## II. Facts

Additional background relevant to the parties' dispute is laid out in the August 21, 2018 order. [98].[1] For convenience, I set forth the two relevant provisions from the Broker Carrier Agreement:

> 6. INDEMNITY. [Extra Logistics] shall defend, indemnify, and hold [Transco] harmless from and against all loss, liability, damage, claim, fine, cost or expense, including reasonable attorney's fees, arising out of or in an y [sic] way related to the performance or breach of this Agreement by [Extra Logistics], . . . including but not limited to, Claims for our [sic] related to personal injury (including death), property damage and [Extra Logistics'] possession, use, maintenance, custody or operation of the Equipment[2]; provided, however, that [Extra Logistics'] indemnification and hold harmless obligations under this paragraph will not apply to any portion of such claim attributable to the tortious conduct of [Transco].
>
> 7. INSURANCE. [Extra Logistics] shall procure and maintain, at its sole cost and expense, the following insurance coverages:
>
> . . . (b) All Risk Broad Form Motor Truck Cargo Legal Liability insurance in an amount not less than $100,000.00 (U.S Dollars) per occurrence. Such insurance policy shall name [Extra Logistics] and [Transco] as insureds and provide coverage to [Transco], the Customer or the owner and/or consignee for any loss, damage or delay related to any property coming into the possession of Carrier under this agreement. The coverage provided under the policy shall have no exclusions or restrictions of any type that would foreseeably preclude coverage relating to cargo claims.

[60-2] §§ 6–7.

---

[1] Bracketed numbers refer to entries on the district court docket.

[2] The Broker Carrier Agreement defines "equipment" to mean, "all equipment necessary or required for the performance of [Extra Logistics'] obligations" under the Broker Carrier Agreement. [60-2] at 2, § 5.

2

### III. Analysis

Extra Logistics advances two arguments: first, that the agreement-to-insure provision contained in the Broker Carrier Agreement ([60-2] at 2, § 7) shifted liability to the third-party insurance carrier, Adriatic Insurance Company, [100] at 5–8, and second, that when all of the provisions of the Broker Carrier Agreement are properly harmonized pursuant to Indiana law, they require relying on the agreement-to-insure clause instead of the indemnity clause. [100] at 8–10.

In support of its first argument, Extra Logistics cites six cases that applied Indiana law to contracts that included agreement-to-insure clauses. *See* [100] at 5–8, citing *Morsches Lumber, Inc. v. Probst*, 180 Ind.App. 202 (3rd Dist. 1979), *Indiana Erectors, Inc. v. Trustees of Indiana Univ.*, 686 N.E.2d 878 (Ind. Ct. App. 1997), *Westfield Ins. Co. v. Travelers Indem. Co. of Am.*, 57 F.Supp.3d 920 (S.D. Ind. 2014); *S. Tippecanoe Sch. Bldg. Corp. v. Shambaugh & Son, Inc.*, 182 Ind.App. 350 (1st Dist. 1979); *Am. Underwriters, Inc. v. Auto-Owners Mut. Ins. Co.*, 719 F.2d 900 (7th Cir. 1983); and *Royal Ins. Co. of Am. v. Nat'l Union Fire Ins. Corp. of Pittsburgh*, 186 F.Supp.2d 895 (N.D. Ind. 2002).

Each of these six opinions rely in part on *Morsches Lumber, Inc. v. Probst*. 180 Ind.App. 202 (3rd Dist. 1979). *See Indiana Erectors*, 686 N.E.2d at 880; *Westfield*, 57 F.Supp.3d at 924; *Am. Underwriters,* 719 F.2d at 902; *Royal Ins. Co. of Am.*, 186 F. Supp. 2d at 899; *S. Tippecanoe Sch. Bldg. Corp.*, 182 Ind.App. at 357. In *Morsches Lumber,* Probst sued Morsches after a barn that Morsches negligently built blew down in a windstorm. 180 Ind.App. at 202–3. The contract the parties had entered

3

into prior to building the barn dictated that Probst was to carry windstorm insurance, but did not specify in what amount. *Id.* at 202–203. The policy Probst purchased ended up "cover[ing] only about 75% of his loss," *id.* at 203, and, after Probst collected on that amount, he sued Morshes seeking to recover the difference. *Id.* The question before the court was "whether an agreement to provide insurance constitutes an agreement to limit the recourse of the party acquiring the policy solely to its proceeds even though the loss may be caused by the negligence of the other party to the agreement." *Id.* at 203. The court concluded that Probst was limited in his recovery to the proceeds of the insurance policy, and noted that, "[t]he fact that he failed to take out a policy sufficient to cover the cost of the undertaking is a cost he will have to bear." *Id.* at 206.

*Morshes Lumber* establishes that (1) Indiana law presumes that an agreement-to-insure clause is intended to be for the parties' mutual benefit, and is intended to shift liability to a third-party insurance company; and (2) that if the party obligated to purchase insurance under an agreement-to-insure clause fails to obtain insurance sufficient to cover the losses sustained, that party will be limited to their recovery under the policy and cannot sue the non-purchasing party to recover the difference, even if the non-purchasing party was negligent in causing the damages sustained. 180 Ind.App. at 203.

One key difference here is that the non-purchasing party (Transco) suffered the loss. Transco paid FedEx $128,595.31 to cover FedEx's losses ([57-7] at 2–3; [60]

4

at 5, ¶ 10; [57-1] at 3, ¶ 8) after a truck driven by an agent of Extra Logistics (or his girlfriend) crashed, damaging the cargo. [81] ¶¶ 5–6; [78-6] ¶ 1.

Extra Logistics believes that *Morsches Lumber* should be applied to prevent Transco from recovering that amount. *See* [100] at 5–7. Not so. *Morsches Lumber* allows recovery on facts such as these; when the non-insurance-purchasing party is the one to suffer the loss, the non-insurance-purchasing party may maintain an action to recover from the insurance-purchasing party. *See also Indiana Erectors, Inc. v. Trustees of Indiana Univ.*, 686 N.E.2d 878, 879–80 (Ind. Ct. App. 1997) ("the party who agreed to purchase insurance has no cause of action against the party for whose benefit the insurance was intended regardless of the fault of this intended insured").

The other cases Extra Logistics cites are all consistent with this holding. In each of them, the party that was obligated to obtain insurance under an agreement-to-insure clause both purchased and maintained an insurance policy that at least partially covered the losses suffered. *Morsches Lumber*, 180 Ind.App. at 202; *Indiana Erectors,* 686 N.E.2d at 881; *Westfield,* 57 F.Supp.3d at 921; *see Am. Underwriters,* 719 F.2d at 901; *Royal Ins. Co. of Am.*, 186 F. Supp. 2d at 897, 899; *S. Tippecanoe Sch. Bldg. Corp.*, 182 Ind.App. at 352. And, consistent with *Morsches Lumber,* to the degree that the insurance policies were insufficient to cover the losses suffered, the insurance-purchasing party was not permitted to recover the difference from the non-insurance-purchasing party. *Morsches Lumber,* 180 Ind.App. at 203; *S. Tippecanoe Sch. Bldg. Corp.*, 182 Ind.App. at 362–63. *See also Westfield,* 57 F.Supp.3d at 925 (*citing Rieth–Riley Constr. Co. v. Auto–Owners Mut. Ins. Co.,* 408 N.E.2d 640 (3rd

5

Dist. 1980) (where lessee was required by contract with lessor to procure an insurance policy and failed to do so, and where lessor's insurance company settled claim that should have been covered by contemplated insurance policy, lessor's insurance company successfully sued lessee for breach of contract)); *Royal Ins. Co. of Am.*, 186 F. Supp. 2d at 897, 899 ("a provision that one party will maintain insurance against certain risks indicates an intention to grant immunity to the other party from liability").

Extra Logistics could not sue Transco for the difference between the limit of the policy obtained and any additional damages suffered. That is all *Morsches Lumber* says. The judgment entered in this case was not inconsistent with *Morsches Lumber*.

When Transco and Extra Logistics agreed that Extra Logistics would purchase insurance, they evidenced an intent to shift some, but not all, liability to a third party—and only liability of a certain type. The Broker Carrier agreement required that Extra Logistics "procure and maintain . . . All Risk Broad Form Motor Truck Cargo Legal Liability insurance in an amount not less than $100,000.00 (U.S Dollars) per occurrence." [60-2] § 7. Presumably, Extra Logistics and Transco knew what types of losses would be covered (and not covered) under an "All Risk Broad Form Motor Truck Cargo Legal Liability" policy, and, likewise, knew the types of exclusionary clauses that would be included in such an agreement. *Premier Elec. Const. Co. v. Ragnar Benson, Inc.*, 111 Ill.App.3d 855, 865 (1982) ("[o]ne is presumed to know the contents and meaning of the obligations he undertakes when he signs a

6

written contract"). Indeed, the Broker Carrier Agreement itself contains language showing that the parties understood and accounted for the types of exclusionary clauses that were to be contained within any insurance policies obtained pursuant to the Broker Carrier Agreement. [60] § 6 ("[t]he coverage provided under the policy shall have no exclusions or restrictions of any type that would foreseeably preclude coverage relating to cargo claims"). In the parties' judgment, losses suffered that fell within exclusions that would not foreseeably preclude coverage—such as the exclusions at issue here[3]—were to be dealt with some other way (e.g., the indemnity provision, discussed below). [60-2] §§ 6–7.

Moreover, while the Broker Carrier Agreement evidences an intent to shift liability to a third party insurance company, it also evidences an intent to place the burden on Extra Logistics to manage that policy and advance claims under it. Again, presumably, Extra Logistics and Transco knew what the terms of such a policy would entail, and knew that Extra Logistics was to "purchase and maintain" a policy that named both Extra Logistics and Transco as insureds. [60-2] § 7. The insurance agreement that Extra Logistics entered into with Adriatic further evidences this intent; Extra Logistics willingly agreed that it would provide the required forms and avoid making material misrepresentations to Adriatic while pursuing claims under the policy. [78-4] at 4–5. Extra Logistics was only entitled to recover under that policy if it complied with those (and other) obligations and so, when Extra Logistics failed

---

[3] If the exclusions at issue here would have foreseeably precluded coverage, then Transco would have had a viable claim against Extra Logistics for breach of contract. *See Rieth–Riley Constr. Co. v. Auto–Owners Mut. Ins. Co.,* 408 N.E.2d 640 (3rd Dist. 1980).

7

to meet those requirements, its claim was "invalidated." [97] at 9–17; [78-4] at 5. Holding Extra Logistics responsible for this failure is consistent, not inconsistent, with the parties' intent, as evidenced in the Broker Carrier Agreement and the insurance policy that was obtained pursuant to that agreement. [60-2] § 7; [78-4] at 4–5.[4]

The indemnity and agreement-to-insure clauses do not conflict. Extra Logistics agreed to indemnify Transco against "all loss," including but not limited to that "arising out of . . . claims for . . . property damage." [60-2] § 6. Read as a whole, under the Broker Carrier Agreement, Extra Logistics is responsible for obtaining the contemplated insurance policy and, to the extent the losses cannot be reimbursed under the policy (whether because the loss amount exceeds the policy coverage or because the loss is not covered at all), Extra Logistics is responsible for indemnifying Transco for all other losses. [60-2] §§ 6–7. In each of the cases cited where the court was called upon to interpret an agreement that contained both an agreement-to-insure clause and an indemnification clause, the provisions shifted liability in different directions. *See Southside River Rail Terminal, Inc. v. CSX Transp., Inc.*, 113 F. App'x 700, 701 (6th Cir. 2004); *Tate v. Trialco Scrap, Inc.*, 745 F. Supp. 458, 474

---

[4] The distinction makes sense in practice, too. If Transco could not recover from Extra Logistics, it would be required to bring an action against Adriatic, wherein it would face the twin disadvantages of having less access to the information necessary to argue that the loss was covered under the policy (e.g., who was driving, what exactly was in the truck at the moment it crashed, etc.) and being responsible for Extra Logistics' failures in maintaining the claim (e.g., making misrepresentations, failing to timely advance the claim, etc.). If non-purchasing parties retain the right to recover directly from purchasing-parties, the party best in position to interact with the insurance company (i.e., the purchasing party) will have the incentive to do so.

(M.D. Tenn. 1989), *aff'd*, 908 F.2d 974 (6th Cir. 1990). In other words, in each of these cases, the non-insurance-purchasing party was charged with indemnifying the purchasing party for amounts falling outside of the insurance policy. *Id*. The loss required that the court determine whether the insurance-purchasing party should be responsible under the agreement-to-insure clause, or the non-insurance-purchasing party should be responsible under the indemnity agreement. *See id*. Here, the issue is simpler: Extra Logistics is responsible under both.

Nor does an application of Indiana law "read out of the agreement" the parties' intent. The agreement-to-insure clause evidences an intent that Extra Logistics pursue insurance claims on both parties' behalf, *see* [60-2] § 7 (requiring that Extra Logistics purchase and maintain the policy), and the indemnity provision evidences an intent to shift any additional liability (whether going beyond the limits of that contemplated insurance policy required or falling outside of that policy entirely) to Extra Logistics. [60-2] §§ 6–7.

Whether under *Morshes Lumber,* any of the other cases cited by Extra Logistics, or the language of the agreement-to-insure and indemnity clauses, the result is the same: Extra Logistics must reimburse Transco for the $128,595.31 that Transco spent to cover the losses sustained in the crash.

## IV. Conclusion

Extra Logistics' motion to alter the judgment, [100], is denied.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: January 14, 2019